**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AMI DUNN,

Plaintiff,

v. Case No. 8:19-cv-2223-WFJ-AEP

GLOBAL TRUST MANAGEMENT, LLC, and
FRANK TORRES,

Defendants.

_______________________________________

ASHANTI MCINTOSH,

Plaintiff,

v. Case No. 8:19-cv-2532-WFJ-AEP

GLOBAL TRUST MANAGEMENT, LLC, and
FRANK TORRES,

Defendants.

_______________________________________/

# ORDER

The Tunica-Biloxi Tribe of Louisiana ("Tribe") was federally recognized in 1981. Their reservation consists of 1,717 acres sited mainly in Avoyelles Parish, Louisiana. The Tribe has 1,226 enrolled members. According to the Tribe,

"Avoyelles Parish was among the poorest in Louisiana, with an unemployment rate higher than the state and national averages." Tunica-Biloxi Tribe of Louisiana Official Website, https://www.tunicabiloxi.org/history (last visited Nov. 12, 2020). This plight started to change in 1994 when the Tribe opened a casino. *Id.*

The Tribal Center has now expanded and boasts of a museum exhibit hall, conservation and restoration laboratory, gift shop, library, auditorium, class and meeting rooms, and tribal government offices. "Traditions of crafts, music, folklore and dance are shared at the annual inter-tribal pow wow and dance competition." *Id.*

The Tribe has embraced other ancient traditions, albeit ones that are new to the Tribe: loansharking and usury. Usury is an ancient crime by which the powerful exploit the most poor and desperate. This act is made all the more unsavory when done, as here, with utter cynicism cloaked in legal camouflage that seeks to enforce loans with annual interest rates of up to 440%.

Usury has been forbidden for millennia by civilized society. The strong victimize the weak. It makes the rich richer and the poor poorer.[1]

[1] Usury indeed pays. From 2011 to 2018, the lending company owned by the Tribe (Mobiloans, Inc.) and two other tribal-affiliated lending companies received more than $325 million in fees over the principal amount borrowed on loans these lenders issued in 17 different states, only a fraction of the states in which the lenders operate. This amount does not even include fees the lenders received on loans where the total fees repaid did not exceed the loan principal. *See* Stipulated Final Consent Order, *CFPB v. Think Fin., LLC*, No. 17-cv-127-BMM (D. Mont. Feb. 6, 2020), ECF No. 107.

The Code of Hammurabi (circa 1750 B.C.) barred usury. Both Plato and Aristotle noted it is immoral and unjust. The Roman Code of Justinian barred usury, as did the Abrahamic religions.[2] The prophet Ezekiel listed usury among abominations like violence and rape. *See Ezekiel* 18:8–21. In *The Inferno*, Dante placed usurers in the seventh circle of hell—below murderers. Shakespeare of course illustrated its corrosive traits in the notorious *The Merchant of Venice*. Usury and loansharking were outlawed in all the American colonies, following English common law practice. And usury is a crime in Florida, *see* Fla. Stat. § 687.071 (2019), as well as the State of Louisiana where the Tribe is located, *see* La. Stat. § 14:511 (2019).

As ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition. That is what we have here, plain and simple. To permit this conduct to continue will simply eviscerate usury laws in every state where operators, hiding behind the cloak of tribal immunity, seek to go.

[2] *See Leviticus* 25:36–37 ("Take thou no interest of him, or increase: but fear thy God; that thy brother may live with thee. /Thou shalt not give him thy money upon interest, nor give him thy victuals for increase."); The Qur'an, *Al-Baqarah* 2:278–79 (Sahih Int'l Translation) ("O you who have believed, fear Allah and give up what remains [due to you] of interest, if you should be believers./ And if you do not, then be informed of a war [against you] from Allah and His Messenger. But if you repent, you may have your principal—[thus] you do no wrong, nor are you wronged.").

Plaintiffs Ami Dunn and Ashanti McIntosh, both Florida residents, received lines of credit from Mobiloans, Inc., an online lending company purportedly owned by the Tunica-Biloxi Tribe. Plaintiffs eventually defaulted on their payments. Defendants Global Trust Management, LLC ("GTM") and Frank Torres, GTM's chief operations officer, purchased the past-due accounts from Mobiloans and tried to collect what Plaintiffs owed. In response, Plaintiffs filed this lawsuit, alleging that Defendants' collection efforts violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, and the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.55, *et seq*. D.Dkt. 1; M.Dkt. 1.[3]

Now before the Court are Defendants' Motions to Compel Arbitration according to the Mobiloans account terms, and Motions, in the Alternative, for Judgment on the Pleadings, D.Dkt. 13; M.Dkt. 24, along with Plaintiffs' responses, D.Dkt. 18; M.Dkt. 31, and Defendants' replies thereto, D.Dkt. 23; M.Dkt. 34. Plaintiffs have also moved in limine to exclude from the Court's consideration what they claim are unauthenticated copies of the Mobiloans account terms that Defendants have produced to support arbitration. D.Dkt. 30; M.Dkt. 43. Defendants have also responded to these motions. D.Dkt. 34; M.Dkt. 44.

---

[3] "D.Dkt." denotes citations to the record in Case No. 8:19-cv-2223-WFJ-AEP, and "M.Dkt." citations to the record in Case No. 8:19-cv-2532-WFJ-AEP.

After reviewing the parties' submissions and with the benefit of oral argument, the Court denies Plaintiffs' Motions in Limine; denies Defendants' Motions to Compel Arbitration; and grants in part and denies in part Defendants' Motions for Judgment on the Pleadings. As explained below, the Court finds Plaintiffs, by applying for internet payday loans and clicking boxes, did click the agreement to arbitrate all disputes related to their credit accounts. But the proposed arbitration proceeding strips Plaintiffs of the ability to vindicate any of their substantive state-law claims or rights. This renders any agreement to arbitrate unconscionable and unenforceable on these unique facts. In truth, the setup is a scheme to hide behind tribal immunity and commit illegal usury in violation of Florida and Louisiana law.

## BACKGROUND

*This tribal payday lending business model*

Before getting to the details of the arbitration agreement, an overview of the tribal payday lending model will afford some useful context.

A payday loan provides a cash advance for people to cover unforeseen expenses. The loan is usually for a small amount, often $500 or so. The borrower must repay the principal plus a finance charge (around 10% of the principal) before the next payday. If the loan is not paid in full, the borrower incurs another finance charge, which is added to the past-due amount. This new balance then becomes

due on the borrower's next payday. This process continues until the borrower pays the loan balance. As a result, the costs associated with a payday loan can be astronomical, with interest rates that can top 1,000% when calculated on an annual percentage basis. *See* Nathalie Martin, *1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions*, 52 Ariz. L. Rev. 563, 565 (2010).

The combination of high interest rates and a vulnerable borrower population provides a ripe target for predatory lenders. Because of this risk, the payday loan industry has also become a target of legislators and regulators at both the federal and state levels.

At the federal level, Congress has passed legislation to protect borrowers from deceptive and abusive lending practices. The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, requires lenders to clearly disclose the true costs of a loan, specifically the finance charges and the annual percentage rate (APR). The Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5301, *et seq.*, established the Consumer Financial Protection Bureau ("CFPB"). The CFPB has authority to bring enforcement actions against lenders for abusive practices that "materially interfere" with consumers' ability to understand the conditions of a consumer finance product, 12 U.S.C. § 5531(d)(1), or that take "unreasonable

advantage" of consumers' lack of understanding of material risks associated with these products, 12 U.S.C § 5531(d)(2)(A).

States have enacted more comprehensive and direct restrictions. Many states require lenders to obtain a state license to issue low-dollar consumer loans and have capped interest rates on these loans. Florida, the Plaintiffs' home state, does both. Lenders must obtain a license from the Florida Office of Financial Regulation to issue consumer loans (those under $25,000) within the state. Fla. Stat. § 516.02(1) (2019).[4] Florida also caps interest on consumer loans at 30% per year. § 516.031(1). Loans that charge excessive interest are unenforceable.[5] § 516.02(2)(c).

Enter the tribes. Native American tribes occupy a unique space in American law. They are "domestic dependent nations that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991). As dependent nations, federally recognized tribes are "subject to plenary control by Congress." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). With their sovereign status,

---

[4] All citations to the Florida Statutes refer to the 2019 version unless otherwise stated.

[5] Florida law delineates between consumer loans and traditional payday loans, also called "deferred presentment transactions," in which the borrower provides the lender with a post-dated personal check to receive funds. Section 560.404 of the Florida Statutes sets the rules for deferred presentment transactions and allows for annualized interest rates higher than those allowed for consumer loans. Internet-generated loans and lines of credit, however, are treated like regular consumer loans, and so their interest rates are capped at 30%.

tribes enjoy common law immunity from suit, absent congressional authorization to the contrary or waiver. *Id.* at 789. This immunity applies equally to suits based on a tribe's commercial activities, "even when [the activities] take place off Indian lands." *Id.* at 790.

Thus, the tribes' unique status offers a path around state regulatory regimes. Leveraging their sovereign status, tribes have created payday lending companies, which, as "arms of the tribe," share in the tribe's sovereign immunity. *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019). This cloak of immunity allows tribal lending companies and lenders who partner with them to attempt to avoid state interest caps and licensing requirements.[6] If this attempt succeeds, the tribal-affiliated lenders are subject only to more indirect federal regulations.

The rise of internet consumer lending has made the tribal lending model immensely profitable and has spurred an increase in the number of tribal-affiliated

[6] Partnerships between payday lenders and the tribes are colloquially referred to as "rent-a-tribe" agreements because the payday lenders will frequently "offer[] tribes compensation to allow the [lenders] to organize under the tribe's name, while the lenders maintain functional control of the entity. Typically, a payday lender will reorganize an existing company under a tribe's name in exchange for monthly payments to the tribe—usually a percentage of monthly profits." *Gibbs v. Rees*, No. 17-cv-386, 2018 WL 1460705, at *1 n.2 (E.D. Va. Mar. 23, 2018) (quoting Heather L Petrovich, Comment, *Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending*, 91 N.C. L. Rev. 326, 342 (2012)).

lenders.[7] Through the internet, these lenders can now reach borrowers across the country, thousands of miles from the reservation.

The internet also allows these lenders to shed the old deferred-presentment model that required a borrower to provide a post-dated check to receive funds. Borrowers can now open "lines of credit" by clicking through a loan agreement offered through a lender's website. The borrowers then give the lender direct access to their bank accounts to deposit funds and withdraw payments. The loan agreement often requires the borrowers to acknowledge the lender's connection to a sovereign tribe and to accept that a specific tribe's laws will govern the loan. And relevant to our purposes here, the borrowers also agree to arbitrate any claims related to the loan according to the laws of the tribe.

The tribal lending model has not escaped criticism. In fact, it has been roundly condemned. As Justice Thomas opined, the use of tribal immunity to skirt state payday loan regulations is just part of the growing trend of exploiting tribal immunity as a form of de facto deregulation that "often extinguishes[] the States' ability to protect their citizens and enforce the law against tribal businesses." *Bay Mills*, 572 U.S. at 823–25 (Thomas, J., dissenting). This gaming of the system

---

[7] Jessica Silver-Greenberg, *Payday Lenders Join with Indian Tribes*, Wall St. J. (Feb. 10, 2011), http://online.wsj.com/article /SB10001424052748703716904576134304155106320.html (noting that in 2010, 35 of the 300 companies making payday loans through the internet were owned by American Indian tribes, and these tribal lenders generated $420 million in payday loans that year).

hurts not only consumers but tribes as well. As scholars have explained, the continued perception that tribal immunity is being exploited to victimize non-Indians otherwise protected under state law invites congressional action and could spell the end for tribal immunity. *See* Alex Tallchief Skibine, *The Indian Gaming Regulatory Act at 25: Successes, Shortcomings, and Dilemmas*, 60 The Federal Lawyer 35, 40 (Apr. 2013); Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 787–88 (2012).

On the enforcement front, attorneys general across the country have cracked down on unlicensed tribal-affiliated lenders seeking to avoid state usury laws. For example, several states, including Florida, have sued and reached multi-million-dollar settlements with CashCall, Inc. and Western Sky Financial, LLC—two online payday lenders that issued usurious loans while claiming tribal affiliation but lacked a connection to a tribe sufficient to confer immunity.[8]

The CFPB has also brought enforcement actions against tribal-owned lenders and companies servicing loans on their behalf. Just this year, the CFPB

---

[8] *See, e.g.*, Press Release, Minn. Com. Dep't, *Minnesota Commerce Department and Attorney General Reach $4.5 Million Settlement with California Company over Illegal, High-Interest Online Loans* (Aug. 18, 2016), https://mn.gov/commerce/media/news/?id=17-253055; Press Release, Office of the Att'y Gen., *Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender* (Feb. 08, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40-million-plus-settlement; Melissa Daniels, *CashCall, Western Sky Reach $1.25M Deal With Fla. AG*, Law360 (Jan. 13, 2017), https://www.law360.com/articles/881067/cashcall-western-sky-reach-1-25m-deal-with-fla-ag.

reached a settlement with Think Finance, LLC, a loan servicer for several tribal lenders including Mobiloans. *See* Stipulated Final Consent Order, *CFPB v. Think Fin., LLC*, No. 17-cv-127-BMM (D. Mont. Feb. 6, 2020), ECF. No. 107. In that case, the CFPB alleged that Think Finance and its subsidiaries operated a common enterprise with tribal lenders to offer and collect on online installment loans that violated state usury laws. *See* Compl., *CFPB v. Think Fin., LLC*, No. 17-cv-127-BMM (D. Mont. Nov. 15, 2017), ECF. No. 1. The CFPB alleged that Think Finance made deceptive demands and illegally took money from borrowers' bank accounts for debts the borrowers did not actually owe because the loans were partially or completely void under the laws of the borrowers' home states. *Id.* The settlement bars Think Finance from assisting tribal lenders in offering or collecting on loans in 17 different states if the loan terms violate state lending laws. Stipulated Final Consent Order, ECF No. 107. In a related nationwide class action, Mobiloans agreed to cancel loans it originated in conjunction with services provided by Think Finance. Order Granting Final Approval of Class Action Settlement, Certifying Settlement Class, and Entering Final Judgment, *Gibbs v. Plain Green, LLC*, No. 17-cv-495 (E.D. Va. Dec. 13, 2019), ECF. No. 141.

Finally, on the arbitration front, courts have invalidated arbitration agreements entered into with tribal-affiliated lenders. One line of decisions has struck down agreements that, through deftly crafted choice-of-law provisions,

waived the application of any federal substantive law to the borrowers' claims in favor of tribal law. This prospective waiver of federal rights rendered the agreements unenforceable on public policy grounds.[9] *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675–76 (4th Cir. 2016); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 333–37 (4th Cir. 2017); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 125–28 (2d Cir. 2019); *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 240–44 (3d Cir. 2020); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 340–45 (4th Cir. 2020). Courts have also struck down agreements when the arbitral forum provided for was illusory because either it did not exist, *see Jackson v. Payday Fin., LLC*, 764 F.3d 765, 776 (7th Cir. 2014); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014), or the forum was completely skewed in the tribe's favor, leaving the borrowers without a fair chance to prevail, *Gingras*, 922 F.3d at 128.

*Plaintiffs' Mobiloans accounts and the agreements to arbitrate*

Plaintiffs opened line-of-credit accounts with Mobiloans in 2015—Dunn in July and McIntosh in October. D.Dkt. 31 at 2; M.Dkt. 44-1 at 1. Mobiloans follows the typical tribal lending model. The company is owned (purportedly) by the

[9] The prospective-waiver doctrine holds that an arbitration agreement that waives the ability to vindicate federally protected rights will not be upheld. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) ("We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . we would have little hesitation in condemning the agreement as against public policy.").

Tunica-Biloxi Tribe. D.Dkt. 13-2 at 3. Mobiloans operates strictly online and offers lines of credit to borrowers in Florida and 28 other states. D.Dkt. 18 at 9; M.Dkt. 31 at 10. Although advancing usurious loans to Floridians, Mobiloans is not licensed to make loans in the state. In fact, it disavows any contact with Florida and claims immunity from Florida laws.

Mobiloans pitches its line-of-credit accounts as a "new, more flexible way to borrow emergency cash" and a way to avoid costly payday loans. Mobiloans Home Page, http://www.mobiloans.com (last visited Oct. 26, 2020). But a Mobiloans line of credit is basically a payday loan without the need for the borrower to present a personal check to receive payment. Borrowers who open an account can receive an initial loan of $200 to $2,500. *Id.* Like a traditional payday loan, the borrower has 14 days to repay the balance. *See* D.Dkt. 31-1 at 3; M.Dkt. 44-2 at 3. If the borrower fails to pay the balance in that time, the borrower incurs a finance charge of around 8 to 10% of the remaining loan principal. *See* D.Dkt. 31-1 at 2–3; M.Dkt. 44-2 at 2–3. At the end of each 14-day billing cycle, the borrower incurs a finance charge based on the remaining principal balance. *Id.* As the billing cycles add up, so do Mobiloans's finance charges, resulting in a loan with interest rates that can soar above 440% on an annual percentage basis. *See* Mobiloans Home Page, https://www.mobiloans.com.

The interest rates Mobiloans charges violate virtually all state usury laws. Indeed, Mobiloans' rates are more than ten-times higher than those Florida allows for consumer loans.[10] *See* Fla. Stat. § 516.031(1) (capping annual interest rates on consumer loans at 30% for loans under $3,000). Mobiloans avoids state usury laws through its connection to the Tribe and by inserting in both its account application and account terms choice-of-law provisions that disclaim all state law in favor of the Tribe's laws, which contain no interest rate caps.[11] *See* D.Dkts. 13-2 at 4; 31-1 at 2; M.Dkts. 24-2 at 4; 44-2 at 2. At the final step of the credit account application, borrowers must check a box stating that they "further understand,

---

[10] The specific interest rate Plaintiffs were asked to pay is not clear. But based on the length of the loans and the balance owed, the rate well exceeded the 30% cap. Counsel for Defendants conceded as much during oral argument:

> THE COURT: [S]ome of these loans are 200% or 400% that your client's affiliate the tribe has, right? You are talking about 200% loans, right?
>
> MR. LITTLE (COUNSEL FOR DEFENDANTS): Yeah, the interest rates are much higher than what Florida law would permit.
>
> THE COURT: Yeah, 200%, right? 200%.
>
> MR. LITTLE: Right. Correct.

Mot. Hr'g Tr. 9–10, *see* D.Dkt. 35; M.Dkt. 45.

[11] The Tribe's laws consist of the Tunica-Biloxi Tribe of Louisiana Arbitration Code, the Tunica-Biloxi Tribe of Louisiana Fairness in Lending Code, the Tribe's Constitution, and Tribal Court opinions. The Codes can be accessed on the Tribe's website. *See* Tunica-Biloxi Tribe of Louisiana Official Website, https://www.tunicabiloxi.org/resources/ (last visited Oct. 21, 2020). The Court could not locate the Tribal Constitution and found the Tribal Court has issued only 13 short opinions between 1997 and 2003. *See* National Indian Law Library: Tribal Law Gateway, https://narf.org/nill/tribes/tunica_biloxi.html (last visited Oct. 21, 2020). The Tribe's Lending Code incorporates federal consumer protection laws, but it does not include caps on interest rates for consumer loans or usury restrictions more generally. The other sources of tribal law contain no such restrictions either.

acknowledge and agree that the line of credit account is governed by the laws of the Tunica-Biloxi Tribe and that the account may not have any limitations on the terms of the account that the laws of my state may provide." D.Dkt. 13-2 at 3; M.Dkt. 24-2 at 3. At this final stage, borrowers must also acknowledge that they consent to and have read and understand the "Mobiloans Line of Credit Terms and Conditions," which can be accessed through the Mobiloans home page. D.Dkt. 31-1 at 2; M.Dkt. 44-2 at 3. Plaintiffs accepted the loan terms.

According to these terms, Plaintiffs consented to the following "Waiver of Jury Trial and Arbitration Agreement," which provides that any dispute related to a borrower's Mobiloans account will be decided in arbitration in accordance with tribal law:

> **WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT**
>
> **In this Waiver of Jury Trial and Arbitration Agreement (this "*Arbitration Agreement*"), "*Tribe*" or "*Tribal*" refers to the Tunica-Biloxi Tribe of Louisiana, a sovereign nation located within the United States of America, and "Tribal Law" means any law or regulation duly enacted by the Tunica-Biloxi Tribe of Louisiana.**
>
> . . . .
>
> ***Agreement to Arbitrate.*** You agree that any Dispute (defined below) will be resolved by arbitration in accordance with Tribal Law.
>
> ***Arbitration Defined.*** Arbitration is a means of having an independent third party resolve a Dispute. A "*Dispute*" is any controversy or claim related in any way to your Mobiloans Credit Account or your application for a Mobiloans Credit Account, involving you and Lender,

> its marketing agent, collection agent, any subsequent holder of your Mobiloans Credit Account, or any of their respective agents, affiliates, assigns, employees, officers, managers, members or shareholders (each considered a "*Holder*" for purposes of this Agreement). The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of your Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (*i.e.*, money, injunctive relief, or declaratory relief). A Dispute includes, by way of example and without limitation, any claim arising from, related to or based upon marketing or solicitations to obtain the Mobiloans Credit Account and the handling or servicing of your Account whether such Dispute is based on a Tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this Account or the Arbitration Agreement.

D.Dkt. 31-1 at 11–12; M.Dkt. 44-2 at 11–12.[12]

Mobiloans avoids the notable pitfalls that have doomed the agreements of other tribal lenders. First, Mobiloans avoids the prospective-waiver doctrine because the Tribe's Lending Code expressly incorporates all federal consumer protection laws. *See* M.Dkt. 34-6 at 4–6, 8–9, 18–19. Thus borrowers can, in theory, pursue federal statutory claims in arbitration, including FDCPA claims. Second, the arbitration agreement provides for an unbiased forum—at least on its face. The agreement allows the borrower to select JAMS or AAA to administer the

[12] These were the terms when Plaintiffs opened their accounts in 2015. Mobiloans has since updated the "***Agreement to Arbitrate***" to state: "You agree that any Dispute (defined below) will be resolved by arbitration in accordance with Tribal Law *and applicable federal law*." Dkt. 13-3 at 17 (emphasis added). However, the updated terms do not materially alter the Court's analysis. The Court will therefore apply the terms in place when Plaintiffs opened their accounts.

arbitration, provided the chosen organization's rules do not conflict with tribal law or the Federal Arbitration Act ("FAA"). D.Dkt. 31-1 at 12; M.Dkt. 44-2 at 12. The arbitration can also take place within thirty miles of the borrower's residence, "provided that this accommodation . . . shall not be construed in any way (a) as a relinquishment or waiver of the Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than Tribal Law or applicable federal law." D.Dkt. 31-1 at 12; M.Dkt. 44-2 at 12. The borrower can also opt out of arbitration by submitting a written request within 60 days of establishing a Mobiloans account. D.Dkt. 31-1 at 11; M.Dkt. 44-2 at 11. But by opting out, the borrower agrees to bring all legal claims related to the account in Tunica-Biloxi Tribal Court. D.Dkt. 31-1 at 11; M.Dkt. 44-2 at 11. Here, Plaintiffs did not opt out of arbitration.

*Defendants' collection efforts and this action*

After opening their accounts, both Plaintiffs received funds from Mobiloans, incurred finance charges, made payments to Mobiloans, and eventually defaulted. D.Dkt. 23-3 at 1–9; M.Dkt. 34-3 at 2–11. After their respective defaults, Defendant GTM bought Plaintiffs' accounts from Mobiloans. D.Dkt. 13-1 at 2; M.Dkt. at 44-1 at 2. At the time of purchase, Dunn's account had an outstanding balance of $1,198.76, and McIntosh's a balance of $1,319.73. *Id.* GTM tried to collect the

outstanding balance of the accounts to no avail.[13] GTM then enlisted third-party collection agencies, Summit Receivables for Dunn's account and Direct Recovery Services, LLC for McIntosh's account, to collect what Plaintiffs owed. D.Dkt. 1 at 5–10; M.Dkt. 1 at 5–11. The third parties' efforts also failed.

Following these failed collection efforts, Plaintiffs each filed a two-count complaint asserting causes of action under the FCDPA (Count I) and FCCPA (Count II). D.Dkt. 1; M.Dkt. 1.The gist of their claims is that Defendants violated both statutes by trying to collect on loans they knew to be usurious and unenforceable under Florida law. D.Dkt. 1 at 11–14; M.Dkt. 1 at 11–14. Under Count I, Plaintiffs also contend Defendants violated the FDCPA by communicating information about the debts to the third-party collection agencies without first receiving Plaintiffs' permission. D.Dkt. 1 at 12; M.Dkt. 1 at 11; *see* 15 U.S.C. § 1692c(b).

Defendants answered the complaints, denying Plaintiffs' claims. D.Dkt. 7; M.Dkt. 16. Defendants now move to compel arbitration in each case based on the arbitration provision in the Mobiloans line-of-credit agreement and, in the alternative, for judgment on the pleadings. D.Dkt. 13; M.Dkt. 24. The Court will address the merits of Defendants' motions in turn.

---

[13] GTM is licensed with the Florida Office of Financial Regulation as a consumer collection agency. D.Dkt. 1-4.

## DISCUSSION

### I. The Motions to Compel Arbitration

The FAA, 9 U.S.C §§ 1–16, governs the enforcement of arbitration agreements and establishes "a liberal federal policy favoring arbitration." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, the FAA commands a district court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (1) a plaintiff entered into a valid "written arbitration agreement that is enforceable 'under ordinary state-law' contract principles," and (2) "the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (citing 9 U.S.C. §§ 2–4).

The parties do not dispute that Plaintiffs' claims fall within the alleged agreement's scope. The quarrel here focuses on the first requirement—validity and enforceability. Plaintiffs make what amounts to a two-pronged attack on this front. First, through their motions in limine, they argue that Defendants have not proven an agreement to arbitrate because the account terms that Defendants have produced to support arbitration are not authenticated. Second, Plaintiffs submit that, even if

proven, the agreement is unenforceable because the arbitral mechanism it provides

for is a "sham." As Plaintiffs argue, borrowers must submit to arbitration all claims

related to their Mobiloans accounts, including those arising under state law. But

once in arbitration, the arbitrator is limited to the Tribe's substantive law, stripping

the borrowers of their ability to vindicate potential state-law claims. This, Plaintiffs

suggest, violates public policy and renders the arbitration agreement

unconscionable and unenforceable.

### A. The delegation clause in the arbitration agreement is unenforceable.

Before deciding the validity or enforceability of the agreement, the Court

must find that it has the authority to make this determination. Typically, the

validity or enforceability of an arbitration agreement is a judicial determination.

*Wiles v. Palm Springs Grill, LLC*, No. 15-CV-81597-KAM, 2016 WL 4248315, at

*2 (S.D. Fla. Aug. 11, 2016). But the agreement here contains a delegation clause

that defers this determination to the arbitrator. D.Dkt. 31-1 at 12; M.Dkt. 44-2 at

12.

Parties can elect to have an arbitrator decide questions of validity and

arbitrability. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). When

an agreement "clearly and unmistakably" delegates these threshold issues to the

arbitrator, the court's work is done—the case must go to the arbitrator. *See id.* at 69

n.1 (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649

(1986)). To avoid this fate, the party opposing arbitration must "challenge[ ] the delegation provision specifically," and establish that it is invalid. *Id.* at 70, 72; *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 (11th Cir. 2016) ("Only if we determine that the delegation clause is itself invalid or unenforceable may we review the enforceability of the arbitration agreement as a whole."). The Plaintiffs have carried their burden.

First, Plaintiffs have directly challenged the delegation clause in their respective motions. D.Dkt. 18 at 13–14; M.Dkt. 31 at 14–15. They argue specifically that the delegation clause is unenforceable because the arbitration agreement disclaims state contract law in favor of the law from a distant and substantively irrelevant Indian tribe, whose law includes no substantive contract law. This leaves the arbitrator to decide the enforceability of the arbitration agreement—a contract—while unable to apply any contract law. This direct challenge to the delegation clause is specific enough. *See Gingras*, 922 F.3d at 126 (tribal lending case: holding that complaint's allegation that delegation provision was induced by fraud was specific challenge "sufficient to make the issue of arbitrability one for a federal court").

Second, the Plaintiffs' assessment of the delegation clause is correct—it is unworkable. While the arbitration agreement gives the borrower the option to choose a reputable organization (JAMS or AAA) to administer the arbitration, it

restricts the arbitrator to applying the Tribe's substantive law—which is limited to an arbitration code and lending code but includes no substantive contract law, or any other identifiable common law for that matter. In practical terms, enforcing the delegation clause would put the arbitrator in the "impossible position" of deciding the validity/enforceability of the agreement without a body of contract law to draw from. *See Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 786 (E.D. Pa. 2016). This also leaves Plaintiffs unable to raise contract defenses to challenge the agreement as the FAA explicitly allows. *See* 9 U.S.C. § 2. For those reasons, the delegation clause fails, and the Court will decide the validity and enforceability of the agreement pursuant to *lex loci actus*.

**B. Florida contract law governs the formation of the arbitration agreement.**

The first step in assessing the validity of an arbitration agreement is to determine which state's contract law should govern its formation. *Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 (11th Cir. 2017). The loan and arbitration agreements state they are governed by Tunica-Biloxi law, which, again, lacks a body of contract law.

With no tribal law to apply, the Court must identify another source of substantive law. Given the Court is exercising federal question jurisdiction, federal common law choice-of-law rules provide the answer. *See Chau Kieu Nguyen v. JP Morgan Chase Bank, NA*, 709 F.3d 1342, 1345 (11th Cir. 2013). Federal common

law follows the approach set forth in the Restatement (Second) of Conflict of Laws. *Id.* With no effective choice by the parties, the Restatement instructs that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188(1) (1971).

Here, that state is Florida, the state where all the relevant activity occurred. Plaintiffs, both Florida residents, opened their Mobiloans accounts from a computer or mobile device in Florida. Disbursements were made to and payments electronically withdrawn from Plaintiffs' bank accounts in Florida. *See* D.Dkts. 1 at 2, 5; 18-1 at 1–2; M.Dkts. 1 at 2, 5; 43-1 at 18. In fact, Plaintiffs never left Florida for any business related to their accounts. *Id.* The parties also agree that Florida law applies as evidenced by the Florida-law-based arguments they make in their respective briefs. D.Dkts. 18 at 9–11; 23 at 2–3, 7–8; M.Dkts. 31 at 9–11; 43 at 7–8. The Court will therefore apply Florida contract law to evaluate the agreement.

**C. Defendants have proven an agreement to arbitrate.**

Next, the inquiry turns to the existence of an agreement to arbitrate, a question of contract formation. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Florida law, a valid contract requires an "offer, [an]

acceptance, consideration," *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004), and mutual assent as to sufficiently definite essential terms, *Gibson v. Courtois*, 539 So. 2d 459, 460 (Fla. 1989). The party seeking to enforce a contract bears the burden to prove these elements by a preponderance of the evidence. *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977).

The existence of a contract is a question of fact. *See Consolo v. A.M.K. Corp.*, 344 So. 2d 1285, 1286 (Fla. 3d DCA 1977) (per curiam). But in the arbitration context, a court can decide an agreement exists as a matter of law if there is no dispute as to any material fact over its formation. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016).[14]

To prove Plaintiffs agreed to arbitrate their claims, Defendants have produced copies of Plaintiffs' loan applications showing they agreed to the Mobiloans account terms; copies of the Mobiloans account terms, which include the arbitration provision; and Defendant Torres's affidavit authenticating these documents. D.Dkts. 13-1; 13-2; 13-3; 31; 31-1; M.Dkts. 24-1; 24-2; 24-3; 44-1; 44-2.

---

[14] At the motion hearing, the parties agreed to forgo a bench trial in favor of having the Court decide the existence of the arbitration agreement based on the affidavits of the Plaintiffs and Defendant Torres. Mot. Hr'g Tr. 3–4, *see* D.Dkt. 35; M.Dkt. 45.

Plaintiffs challenge the arbitration agreements by moving to exclude the documents Defendants have produced to prove them as inadmissible hearsay.[15] D.Dkt. 30; M.Dkt. 43. But as Defendants rightly point out, the documents are admissible according to the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6); D.Dkt. 34; M.Dkt. 44. Under the Federal Rules, a document is admissible as a business record if: (1) it was "made at or near the time by—or from information transmitted by—someone with knowledge"; (2) it was "kept in the course of a regularly conducted activity"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the custodian or another qualified witness"; and (5) "the opponent does not show that the source of the information or method or circumstances of preparation suggest a lack of trustworthiness." Fed. R. Evid. 803(6)(A)–(E). Even with these requirements, the Eleventh Circuit instructs that "[t]he touchstone of admissibility under [Rule 803(6)] is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1183 (11th Cir. 2006) (quoting *United States v. Bueno–Sierra*, 99 F.3d 375, 378–79 (11th Cir. 1996)).

---

[15] The Plaintiffs sought to subpoena the originator of the documents, Mobiloans, to verify the documents' authenticity. Mobiloans declined to participate in the lawsuit or the subpoena, asserting tribal immunity. D.Dkt. 30-1, Ex. E; M.Dkt. 43-1, Ex. B.

Plaintiffs' attack focuses on the first element. They assert Defendant Torres lacked the requisite personal knowledge to verify the account terms and arbitration provisions because he was not an employee of Mobiloans or familiar with its business practices. D.Dkt. 30 at 3–7; M.Dkt. 43 at 3–7. But Plaintiffs construe this element too narrowly. To satisfy the knowledge requirement, Rule 803(6) requires only that a person who can explain the record-keeping procedure must testify. *United States v. Garnett*, 122 F.3d 1016, 1018–19 (11th Cir. 1997). This is not limited to one who has direct personal knowledge of the records' contents, their authors, or even their preparation. *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1268 (11th Cir. 2015). In fact, this does not require first- or even secondhand knowledge of the records' creation. *Id.* at 1268–69; *see, e.g.*, *Allen v. Safeco Ins. Co. of Am.*, 782 F.2d 1517, 1519 (11th Cir. 1986).

Records of one business can also become the business records of another. A successor business, like GTM here, can admit the records it obtains from another if the "successor business integrates them within its own records . . . [,] regularly relies upon those records[,] and the circumstances indicate the records are trustworthy." *Wilmington Sav. Fund Soc'y, FSB v. Bus. Law Grp., P.A.*, No. 15-CV-2831-T-36TGW, 2017 WL 10276172, at *2 (M.D. Fla. Feb. 15, 2017).

In his affidavit, Defendant Torres states that as chief operations officer he has personal knowledge of GTM's business practices and how the company

maintains and oversees the accounts it purchases. D.Dkt. 31 at 1; M.Dkt. 44-1 at 1. He confirmed that GTM obtained and integrated into its records Plaintiffs' Mobiloans credit agreements and account information upon purchasing Plaintiffs' accounts. *Id.* GTM then relied on the account documents as evidenced by their collection efforts that spawned this lawsuit. This is enough.

Plaintiffs offer no other meaningful challenge to the agreements other than to say they do not remember agreeing to the arbitration provision. D.Dkt. 18-1; M.Dkt. 43-1, Ex. C. No doubt this is true given the "computer screen click-through" nature of the application. But mere denials and conclusory statements without evidentiary support will not rebut a written agreement. *See Larsen*, 871 F.3d at 1307.

In short, the Court believes Torres has produced the authentic internet records that Plaintiffs filled out for the loans. That the records are likely bona fide does not mean the scheme that produced them is. Torres and his company subject themselves to Florida law to collect usury from Florida debtors. The source of the debt, whom Torres pays for this right, remains at all times untouchable and uncooperative behind sovereign tribal immunity. In any case, Defendants have sufficiently proven the existence of an agreement to arbitrate, and Plaintiffs' Motions in Limine are denied. The inquiry now turns to whether the arbitration agreement is enforceable.

**D. The arbitration agreement is unconscionable and thus unenforceable.**

Section 2 of the FAA provides that a written agreement to submit disputes to arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." It follows that any "generally applicable contract defenses, such as fraud, duress, or unconscionability" can defeat an arbitration agreement. *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Plaintiffs have chosen to assert unconscionability. D.Dkt. 18 at 6–13; M.Dkt. 31 at 6–14.

Unconscionability is a common law doctrine that courts have traditionally invoked to prevent overreaches by one party who seeks to gain "an unjust and undeserved advantage which it would be inequitable to permit him to enforce." *Steinhardt v. Rudolph*, 422 So. 2d 884, 889 (Fla. 3d DCA 1982) (quoting *Peacock Hotel, Inc. v. Shipman*, 138 So. 44, 46 (Fla. 1931)). When such an overreach has occurred, a court "will not hesitate to interfere," even though the victimized parties owe their predicament largely to their own credulity. *See id.* In Florida, to be unenforceable an agreement or a contractual provision must be both procedurally and substantively unconscionable. *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1157 (Fla. 2014).

Procedural unconscionability contemplates the conditions under which the contract was formed. It looks to the "circumstances surrounding the transaction to

determine whether the complaining party had a meaningful choice at the time the contract was entered." *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 284 (Fla. 1st DCA 2003) (internal quotation marks omitted). Factors informing the analysis include "whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract, or whether the terms were merely presented on a 'take-it-or-leave-it' basis; and whether [the complaining party] had a reasonable opportunity to understand the terms of the contract." *Id*. As one Florida court has explained, while this usually "requires an examination into a myriad of details including [the complaining party's] experience and education and the sales practices that were employed by the [other party] . . . , the basic concept is 'an absence of meaningful choice.'" *Kohl v. Bay Colony Club Condo., Inc.*, 398 So. 2d 865, 869 (Fla. 4th DCA 1981).

Substantive unconscionability, on the other hand, relates to the terms of the agreement itself. *Basulto*, 141 So. 3d at 1159. It requires a showing that the terms are not only unreasonable but "amount to an outrageous degree of unfairness." *Steinhardt*, 422 So. 2d at 889. Put another way, the agreement is one that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Hume v. United States*, 132 U.S. 406, 411 (1889). An example of such an agreement in the arbitration context "is one that deprives a claimant of an effective way to vindicate a statutory cause of action in

the arbitral forum." *AMS Staff Leasing, Inc. v. Taylor*, 158 So. 3d 682, 688 (Fla. 4th DCA 2015); *see, e.g., Romano ex rel. Romano v. Manor Care, Inc.*, 861 So. 2d 59, 61–64 (Fla. 4th DCA 2003) (finding that an arbitration agreement was substantively unfair because it did not provide adequate mechanisms for patients to vindicate their statutory rights under Florida's Nursing Home Resident's Rights Act).

Though unconscionability requires a plaintiff to establish both procedural and substantive unconscionability, these factors "should be evaluated interdependently rather than as independent elements." *Basulto*, 141 So. 3d at 1161. The court should take something of a "balancing, or sliding scale, approach" to the analysis. *Id.* at 1159. "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (quoting *Romano*, 861 So. 2d at 62). Under this approach, the Court may give greater weight to one prong "provided that there is at least a modicum of the weaker prong." *VoiceStream Wireless Corp. v. U.S. Commc'ns, Inc.*, 912 So. 2d 34, 39 (Fla. 4th DCA 2005). Applying this framework, the arbitration provision here is both procedurally and substantively unconscionable.

***1. Procedural unconscionability.***

The conditions under which Plaintiffs agreed to arbitrate their claims reflect a lack of meaningful choice. For starters, the Mobiloans application is a classic adhesion contract[16]—a "strong indicator" of procedural unconscionability. *Gainesville Health*, 857 So. 2d at 285. The account terms are nonnegotiable. Borrowers either agree to them or they do not receive funds.[17]

These types of loans are designed for, and cater to, unsophisticated people. In an adhesion contract, the consumer lacks bargaining power, but this is especially true in the payday loan context. Prospective payday loan borrowers are often in dire straits. Outfits like Mobiloans are usually lenders of last resort that borrowers turn to only after failing to obtain a credit card or low-interest personal loan from a chartered bank. This puts the prospective borrowers in a position to accept any terms offered to them.

Compounding these pressures is how the arbitration agreement was presented. Plaintiffs were directed to the line-of-credit terms at the last step of their Mobiloans account application. To view the agreement, Plaintiffs had to open the

---

[16] "An adhesion contract" is a "standardized contract form offered to consumers of goods and services on essentially [a] 'take it or leave it' basis without affording [the] consumer [a] realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain [the] desired product or services except by acquiescing in the form contract." *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st DCA 1999) (quoting Black's Law Dictionary (6th ed. 1990)).

[17] The opt-out provision does not change things, as will be explained in the discussion of substantive unconscionability.

account terms using a separate link on the Mobiloans home page. Assuming Plaintiffs opened the link, the arbitration provision is on page twelve of the account terms and itself consists of two pages of dense legalese—a lot for unsophisticated consumers to digest, particularly on their own. Presenting the arbitration provision in this way—especially given the take-or-leave-it context of the whole application process—ensures borrowers have little choice but to accept it, just as Plaintiffs did here.

***2. Substantive unconscionability.***

Plaintiffs argue the agreement is unconscionable in substance because it deprives them of the chance to vindicate their state-law rights. D.Dkt. 18 at 6–13; M.Dkt. 31 at 6–14. The agreement forces all disputes related to the Mobiloans credit account into arbitration, including potential state-law claims, while requiring the arbitrator to apply tribal law to the exclusion of all other state law. By doing so, Plaintiffs contend "Mobiloans makes clear the intent of the arbitration provision at issue is not to provide an alternative means of dispute resolution in which aggrieved persons may bring their claims, but rather to take those claims away." D.Dkt. 18 at 8; M.Dkt. 31 at 8 (citing *Hayes*, 811 F.3d at 673–74). Plaintiffs say this effective waiver of state-law claims renders the arbitration provision unenforceable. D.Dkt. 18 at 7–8; M.Dkt. 31 at 8–9.

Choosing to apply one jurisdiction's laws over another's does not by itself invalidate an arbitration agreement. Parties are generally free to agree that a specific jurisdiction's laws will govern a transaction. *See Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013). Plaintiffs cite the Fourth Circuit's opinion in *Hayes*, and other cases relying on it, as establishing the proposition that arbitration agreements applying tribal law to the exclusion of all state law are unenforceable as a matter of public policy. *See* D.Dkt. 18 at 8–11; M.Dkt. 31 at 8–11. But *Hayes* does not stretch that far. There, the court held that the arbitration agreement was unenforceable because it exclusively applied tribal law and disclaimed all *federal* substantive law, which violated the so-called prospective-waiver doctrine established by the U.S. Supreme Court. *Hayes*, 811 F.3d at 673–74. True, *Hayes* and some decisions applying its holding mention that the waiver of federal *and* state substantive rights made the arbitration agreements in those cases unenforceable. *Id.* at 676; *Gingras*, 922 F.3d at 127. But the waiver of federal rights was the precedential hook those courts relied on to strike down the agreements.

For this reason, *Hayes* and its progeny cannot carry Plaintiffs to the finish line because there is no prospective waiver of federal rights here. The Tribe's laws explicitly incorporate the FAA and federal consumer protection laws, probably at the advice of lawyers to avoid the *Hayes* opinion.

But prospective-waiver doctrine aside, the arbitration agreement abrogates Plaintiffs' state-law claims in a way that is equally unjust. The reason for this is two-fold. First, the choice to apply tribal law to Plaintiffs' potential claims is unenforceable. It undermines fundamental consumer protection policies of Plaintiffs' home state—Florida—the jurisdiction with the strongest material connection to the agreement. Second, the dubious choice-of-law provision becomes particularly problematic in arbitration. The Tribe's Arbitration Code governs the arbitration proceeding and precludes borrowers from challenging the waiver of their state law rights in favor of tribal law. The Code then bars outside judicial review of the arbitrator's decision. D.Dkts. 31-1 at 11–13; M.Dkt. 44-2 at 11–13; 34-5 at 3, 8.

In short, the arbitration agreement provides a one-two combination that knocks out Plaintiffs' potential state-law claims. One—the agreement's choice-of-law provision waives substantive Florida-law protections in exchange for the Tribe's laws, which allow interest rates more than ten-times what would be permitted otherwise. Two—that waiver becomes unchallengeable and unreviewable once the Plaintiffs are forced into arbitration. Simply put, this scheme seeks to abuse the arbitral forum by using it to evade state consumer finance protections and usury laws that Mobiloans (now Defendants) could not

otherwise avoid. This sort of charade is not what Congress had in mind when it passed the FAA.

*a. The choice-of-law provision is invalid and Florida law applies to the agreement.*

The first step in invalidating the agreement requires a showing that the election to apply tribal law to Plaintiffs' claims is invalid. To make this assessment, the Court will again turn to the Restatement. The Restatement (Second) of Conflict of Laws provides that courts will apply the law of the state chosen by the parties to govern their contractual rights and duties unless the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws § 187(2)(b).

The arbitration agreement's selection of tribal law fails this test—it flouts Florida's fundamental policy protecting consumer borrowers. As the Restatement instructs, "[t]o be 'fundamental,' a policy must in any event be a substantial one." *Id.* § 187, cmt. g. The "policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *Id.*

The Florida Legislature has enacted such a statute—the Florida Consumer Finance Act (“FCFA”)[18]—to protect consumer borrowers from lenders like Mobiloans. As noted, the Act first imposes a licensing requirement for lenders. All lenders issuing consumer loans (less than $25,000) in Florida must first register with and obtain a license from the Florida Office of Financial Regulation (FOFR). Fla. Stat. § 516.02(1). Licensed lenders must keep records related to the loans they issue and are subject to FOFR oversight and investigation. *See* § 516.11–516.12.

The FCFA also strictly limits interest rates on consumer loans. As already noted, interest rates on loans for under $3,000 cannot exceed 30% on an annual percentage basis. § 516.031(1). Loans exceeding this rate are unenforceable. *See* § 516.02(2)(c). In fact, lenders imposing excessive or illegal charges are subject to disciplinary action by the FOFR, *see* § 516.07(e)1., and can even face criminal charges, *see* Fla. Stat. § 687.071(3) (establishing that charging interest rates exceeding 45% is a third-degree felony).

Florida actively enforces the FCFA as well. Indeed, as noted in the overview of the tribal lending model, Florida’s Attorney General has sought to enjoin unlicensed tribal-affiliated payday lenders from using practices like those used by Mobiloans. *See Off. of Att’y Gen., Dep’t of Legal Affs. v. W. Sky Fin., LLC*, No. 13-CA-15462, (Fla. 13th Cir. Ct.).

---

[18] Fla. Stat. §§ 516.01–516.36.

To the second part of the Restatement inquiry, Florida has a "materially greater" interest than the Tunica-Biloxi Tribe in applying its laws in this case. The lines of credit extended here were issued in Florida to Florida residents, and, as noted already, all activity related to the accounts occurred in Florida. D.Dkts. 1 at 2, 5; 18-1 at 1–2; M.Dkts. 1 at 2, 5; 43-1 at 18.

By contrast, no material interest supports applying the Tribe's laws. First, "[t]ribal law is generally unavailable outside of the reservation." *Gingras*, 922 F.3d at 127. Tribal sovereignty and the applicability of a tribe's laws center "on the land held by the tribe and on tribal members within the reservation." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 327 (2008). Outside the reservation, particularly when non-members are involved, the tribe's sovereign authority gives way to the state's regulatory power, and tribal actors must conform their conduct to state law. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (holding that state could collect sales tax from ski resort owned by tribe that was located outside reservation's borders). The Court finds even less incentive to apply the Tribe's laws here when the reason for doing so would be to short circuit state consumer protection laws and advance a usurious lending scheme for the Defendants' financial benefit—especially when Defendants have no visible connection to the Tribe. This is an unworthy purpose. *Otoe-Missouria Tribe of*

*Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014) ("[A] tribe has no legitimate interest in selling an opportunity to evade state law.").

Defendants counter that Florida does not recognize a strong public policy to justify applying its usury laws under the circumstances. At least, they argue, the policy is not strong enough to trump the freedom to contract when parties have agreed to apply another jurisdiction's laws. M.Dkt. 34 at 7–8; *see, e.g.*, *Cont'l Mortg. Invs. v. Sailboat Key, Inc.*, 395 So. 2d 507, 508, 513 (Fla. 1981); *Morgan Walton Props., Inc. v. Int'l City Bank & Tr. Co.*, 404 So. 2d 1059, 1062–63 (Fla. 1981). Defendants point to cases which state that when parties have agreed to apply a foreign jurisdiction's laws, Florida courts will typically enforce that choice, even when it is plainly intended to avoid Florida's usury laws, so long as the chosen jurisdiction bears a "normal relation" to the transaction. M.Dkt. 34 at 7–8; *see, e.g.*, *Cont'l Mortg.*, 395 So. 2d at 513; *Morgan*, 404 So. 2d at 1062–63; *L'Arbalete, Inc. v. Zaczac*, 474 F. Supp. 2d 1314, 1321 (S.D. Fla. 2007). Defendants contend that the arbitration agreement's choice-of-law provision bears a normal relation to Mobiloans, the original party to the agreement, making it enforceable. M.Dkt. 34 at 8.

Defendants' general point is true in the commercial context as between sophisticated parties—the context for the cases cited in the preceding paragraph that Defendants rely on. But Florida courts have not applied this same rationale in

the consumer context. *See* F. T. Hawkes, *The Conflict of Laws and the Florida Usury Case*, 9 Fla. St. U. L. Rev. 543, 568–573 (1981). And for good reason. The same interests and considerations are not at play in a consumer transaction. Consumers lack the sophistication of a commercial entity, and the concern for protecting the freedom to contract gives way to the need to protect a vulnerable party. The state legislature understood the difference between the two contexts, which is likely why it passed the FCFA to regulate consumer lenders and protect those in Plaintiffs' exact position. Accordingly, Florida has a material interest in regulating loans issued within its borders to its residents. The choice to apply the Tribe's laws is therefore unenforceable.

*b. The arbitration scheme locks in the invalid choice-of-law provision and excludes outside judicial review.*

An unenforceable choice-of-law clause does not necessarily doom the whole arbitration agreement. *See Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005) (noting that if "offensive terms are severable, then the court must compel arbitration according to the remaining, valid terms of the parties' agreement"). But the clincher for the Plaintiffs here is that once in arbitration the invalid choice of law becomes unassailable.

According to the Tribe's Arbitration Code, which the arbitrator must abide by, the choice to apply tribal law to the substantive claims arising from the Mobiloans line of credit:

> [S]hall be valid and enforceable, and not subject to revocation by one Party without the consent of the other Party or parties thereto, provided that the subject matter of the agreement or claim, dispute or controversy arising thereunder, or at least one of the parties thereto, shall have sufficient contact with the jurisdiction so selected.

M.Dkt. 34-5 at 3.

This provision of the Arbitration Code is designed to lock in the waiver of all state-law claims. Likely, the only arbitration agreements that will find their way within this provision's scope will be the Mobiloans agreements. All these agreements will contain a clause electing to apply tribal law exclusively, and one of the parties to the agreement (Mobiloans) will always have "sufficient contact" with the Tribe to make the choice-of-law provision enforceable. Tribal law will therefore always apply to the arbitration proceeding—excluding any other state's law and any related claims.

The borrower is then effectively unable to appeal this waiver. The Tribe's Arbitration Code and the Mobiloans agreement both provide that the Tribal Court has sole power to review the arbitrator's decision. Also applying tribal law, the Tribal Court will almost certainly uphold the improper choice-of-law provision. The arbitration agreement and the Arbitration Code then prohibit the borrower from seeking outside judicial review—a prohibition that itself is unlawful. *See Alterra Healthcare Corp. v. Bryant*, 937 So. 2d 263, 267 (Fla. 4th DCA 2006) ("The complete waiver of a right to appeal any arbitration decision . . . is

unenforceable as contrary to public policy."). And so, the very entity that profits from the usury is the final adjudicator of a borrower's claims.

The errant choice-of-law provision is not severable from the agreement. It is a basic principle of contract law that "an unenforceable provision cannot be severed when it goes to the 'essence' of the contract." *Hayes*, 811 F.3d at 675–76 (citing 8 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 19:73 (4th ed. 1993)). The animating purpose of the arbitration agreement here is to use the selection of tribal law and insular review process to allow Mobiloans to engage in lending practices off the reservation that otherwise would be illegal. Severance should not be used to condone such an "integrated scheme to contravene public policy." *Id.* at 676 (quoting *Graham Oil Co. v. ARCO Prods. Co.*, a *Div. of Atl. Richfield Co.*, 43 F.3d 1244, 1249 (9th Cir. 1994), *as amended* (Mar. 13, 1995)). And the Court will not apply the doctrine here.

The opt-out provision does not save the agreement either. It provides only the illusion of choice. Had Plaintiffs opted out of arbitration, they would have found themselves in front of the Tribal Court—still subject to tribal law and unable to raise Florida-law claims, only in a distant and more unfriendly forum. *Gingras*, 922 F.3d at 128 (finding that similar opt-out provision did not save an arbitration agreement because it "merely put[] plaintiffs in tribal court—the same hostile forum in which they would end up after arbitration.").

In sum, all roads lead to tribal law with no way out. As a result, Plaintiffs cannot vindicate the rights provided to them under Florida law and, further, are cut off from seeking realistic appellate review. This is substantively unfair.

***3. The arbitration agreement is unconscionable under the applicable sliding-scale framework.***

Applying Florida's sliding-scale framework, the arbitration agreement is unconscionable. If viewed independently, the terms of the agreement or the conditions under which it was entered, standing alone, might not render the agreement unenforceable. For example, an adhesion contract that would allow for state law claims or an agreement that applies tribal law between two sophisticated, commercial parties might be permissible. But the combination of the procedural and substantive factors at play here simply proves to be too much.

As the preceding analysis makes clear, the entire arbitration scheme provided for here is a sham. It is a thinly veiled effort to avoid state usury laws and statutes that states have enacted to protect their most vulnerable residents from high-interest lenders like Mobiloans. Even more troubling is that the scheme here has been carefully crafted to sidestep the pitfalls that have doomed similar arbitration agreements. Though more cleverly disguised, the arbitration mechanism envisioned by the Mobiloans agreement still does not provide the fair and just

alternative forum envisioned by the FAA. The Motions to Compel Arbitration are denied.[19]

**II. The Motions for Judgment on the Pleadings**

Defendants move in the alternative for judgment on the pleadings for Plaintiffs' FDCPA and FCCPA claims. "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). In determining whether a party is entitled to judgment on the pleadings, the Court accepts as true all material facts alleged in the nonmovant's pleadings and views those facts in the light most favorable to the nonmovant. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). If a comparison of the averments in the competing pleadings reveals a dispute of material fact, judgment on the pleadings must be denied. *Id.* (citing *Stanton v. Larsh*, 239 F.2d 104, 106 (5th Cir. 1956)).[20]

The FDCPA and FCCPA both seek to protect consumers from abusive debt collection practices. To this end, the FDCPA prohibits debt collectors from using

---

[19] Because the Court denies Defendants' Motions to Compel Arbitration based on the unconscionability of the arbitration agreement, it will not consider Plaintiffs' alternative argument that Defendants waived the right to arbitrate through their substantial participation in litigation. D.Dkt. 18 at 14–17; M.Dkt. 31 at 15–17.

[20] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit before October 1, 1981.

"any false, deceptive, or misleading representation or means in connection with the collection of any debt" and any "unfair or unconscionable" means of collection. 15 U.S.C. § 1692e and § 1692f. The FCCPA bans similar practices. *See* Fla. Stat. § 559.72.

To prevail on an FDCPA claim, a plaintiff must prove that: "(1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Lima v. Bank of Am., N.A.*, 249 F. Supp. 3d 1308, 1312 (S.D. Fla. 2017) (quoting *Kaplan v. Assetcare, Inc.*, 88 F. Supp. 2d 1355, 1360–61 (S.D. Fla. 2000)). An FCCPA claim requires a showing that the defendant asserted a legal right that did not exist, and the defendant knew the right did not exist. *See* Fla. Stat. § 559.72(9).

Here, Plaintiffs' theory for each count turns on the unenforceability of their debts under Florida law. Plaintiffs assert that Defendants in their collection efforts knowingly misrepresented the validity of the debts, which they knew were usurious and unenforceable, thereby violating both the federal and state collection statutes. D.Dkt. 1 at 11–14; M.Dkt. 1 at 11–15. As a second theory for the FDCPA count, Plaintiffs claim that Defendants' communication of information about the debts to the third-party collectors without Plaintiffs' prior consent violated 15 U.S.C. § 1692c(b).

Defendants counter that they are entitled to judgment as a matter of law on all claims. First, they maintain that the loan agreement's tribal choice-of-law provision defeats the claims arising under § 1692e, § 1692f, and the FCCPA. D.Dkt. 13 at 12–14; 23 at 10; M.Dkt. 24 at 12–14; 34 at 10. Second, they argue the § 1692c(b) claims fail because the communications to the third-party collectors were not made in "connection with the collection of any debt" as the Eleventh Circuit has construed this phrase. D.Dkt. 13 at 14–15; M.Dkt. 24 at 19–20.

Defendants' first argument can be quickly dispensed with; it fails for the reasons already explained. Like the provision in the arbitration agreement, the tribal choice-of-law provision in the Mobiloans account terms is invalid, and so Plaintiffs' accounts are subject to Florida law.

Because Florida law applies to the accounts, Plaintiffs state valid causes of action under the FDCPA (§ 1692e and § 1692f) and FCCPA. Their debts resulted from usurious contracts, rendering the debts unenforceable. *See* Fla. Stat. §§ 516.02(2)(c), 687.071(7). Efforts to collect debts unenforceable under state law can be the basis for an FDCPA or FCCPA action. *See Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 512 (S.D.N.Y. 2015) (holding that attempt to collect a debt considered usurious under New York law "constitute[d] an unlawful threat under the FDCPA"); *Chulsky v. Hudson Law Offs., P.C.*, 777 F. Supp. 2d 811, 821 (D.N.J. 2011), *amended in part*, 777 F. Supp. 2d 823 (D.N.J. 2011) (holding

allegation that lender misrepresented its ability to collect a debt under state law was enough to plead a § 1692e claim). Thus, judgment on the pleadings is not appropriate.[21]

That said, Plaintiffs' FDCPA claims premised on § 1692c(b) fail. To state an FDCPA claim under this provision, a debt collector must make a communication to a third party in connection with the collection of the debt. In the Eleventh Circuit, courts read communication "in connection with the collection of any debt" to mean a statement that makes an express or implied demand for payment and warns of additional fees or actions if payment is not tendered. *See Farquharson v. Citibank, N.A.*, 664 F. App'x 793, 801 (11th Cir. 2016).

Here, the communications to the collection agencies made no demand for payment. Plaintiffs instead seem to conflate Defendants' communications to *facilitate* the collection of the outstanding debts with a communication demanding payment. Section 1692c(b) punishes only the latter, which does not include communications to a third-party collection agency. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, No. 19-CV-983-T-60SPF, 2019 WL 5578878, at *3 (M.D. Fla. Oct. 29, 2019) (dismissing § 1692c(b) claim because defendant's communication to collection agency was not a "communication in connection with

[21] McIntosh's individual allegation that Defendants violated § 1692e(11) based on DRS's failure to identify itself as a debt collector in its email containing the "hardship letter" cannot stand. In the email, DRS clearly identified itself as a debt collector. M.Dkt. 1-1 at 21.

the collection of a debt" but "simply . . . a communication with a third party").

Accordingly, Plaintiffs' § 1692c(b) claims alleged in Count I fail. *See Genord v. Blue Cross & Blue Shield of Mich.*, No. 07-21688-CIV, 2008 WL 5070149, at *5 (S.D. Fla. Nov. 24, 2008) (granting judgment on the pleadings and dismissing claims without prejudice).

## CONCLUSION

For the reasons provided above, the Court **ORDERS** the following:

In Case No. 19-cv-2223:

- Plaintiff Dunn's Motion in Limine (Dkt. 30) is **DENIED.**

- Defendants' Motion to Compel Arbitration (Dkt. 13) is **DENIED**.

- Defendants' Motion for Judgment on the Pleadings (Dkt. 13) is **GRANTED** without prejudice on Count I as to the claim stated under § 1692c(b) and **DENIED** as to Count I for the claims stated under § 1692e, § 1692f and Count II: Violation of Florida's Consumer Collection Practices Act.

In Case No. 19-cv-2532:

- Plaintiff McIntosh's Motion in Limine (Dkt. 43) is **DENIED.**

- Defendants' Motion to Compel Arbitration (Dkt. 24) is **DENIED.**

- Defendants' Motion for Judgment on the Pleadings (Dkt. 24) is **GRANTED** without prejudice on Count I as to the claim stated under §

1692c(b) and **DENIED** as to Count I for the claims stated under § 1692e,

§ 1692f and Count II: Violation of Florida's Consumer Collection

Practices Act.

Plaintiffs may file amended complaints within fourteen days.

**DONE AND ORDERED** at Tampa, Florida, on December 10, 2020.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record